Date signed March 31, 2011



**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| WINCOPIA FARMS, LP, | * | Case No. 07-15899-JS |
| Debtor | * | Chapter 11 |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

| | | |
|---|---|---|
| WINCOPIA FARMS, LP, | * | |
| Plaintiff | * | |
| v. | * | Adv. Proc. No. 07-0908-JS |
| G&G, LLC, and | * | |
| TRENT GOURLEY, | | |
| | * | |
| Defendants | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

### UNITED STATES BANKRUPTCY COURT'S
### REPORT AND RECOMMENDATION
### TO THE UNITED STATES DISTRICT COURT
### THAT ADVERSARY PROCEEDING BE DISMISSED

## INTRODUCTION

This Court delayed the writing of this opinion in the expectation that it would not be necessary after the Office of the United States Trustee filed a motion to dismiss or convert the underlying bankruptcy case on September 2, 2010; but the motion was withdrawn on December 9, 2010, upon the debtor's payment of quarterly fees and filing of operating reports. The plaintiff/debtor is a single asset real estate bankruptcy in which the real estate has been foreclosed upon and sold.

The instant adversary proceeding was initiated in the U. S. Bankruptcy Court for the District of Maryland by the debtor on November 9, 2007. On April 9, 2008, the debtor filed a first amended complaint which this Court dismissed on March 25, 2009. Presently before this Court are the debtor/plaintiff's motion to file a second amended complaint, the defendants' motion to prohibit the plaintiff from filing a second amended complaint and the defendants' motion to dismiss.

The plaintiff stated in all three complaints that they were core proceedings pursuant to 28 U.S.C. §157(b), which the defendants did not contest. Nevertheless, this Court has determined in this opinion that both the first amended and second amended complaints are non-core, related proceedings which this Court may hear and determine, but in which it may not enter final orders, pursuant to 28 U.S.C. §157(c). Wherefore, this opinion is presented in the form of Proposed Findings of Fact and

Conclusions of Law to be transmitted to the U. S. District Court, pursuant to Federal Rule of Bankruptcy Procedure 9033.

In an earlier opinion, issued March 25, 2009 [P. 151],[1] this Court granted the motion of the defendant, G&G, LLC to dismiss the complaint brought against it by the debtor, Wincopia Farms Limited Partnership ("WLP") for lack of standing to sue. On March 31, 2009, WLP filed a motion [P. 161] to reconsider the dismissal only as to Count II of the complaint which alleged fraud. The motion asserted that the opinion had erroneously concluded that the plaintiff's guarantee was governed by Virginia law, rather than the law of Maryland. Having reviewed the guarantee and acknowledging its error, this Court granted the plaintiff's motion for reconsideration by order [P. 175] dated May 29, 2009.[2]

This Court has reached the legal conclusion that under Maryland law, the debtor/guarantor of a loan is without standing to sue the lender for alleged fraudulent misconduct in making a loan to the borrower, absent an independent harm to the guarantor. For the reasons set forth, it is hereby recommended to the U.S. District

---

[1]*Wincopia Farms, LP v. G&G LLC*, 2009 WL 801733 (Bankr. D. Md. 2009).

[2]The dismissal order of March 25, 2009, was vacated only as to Count II (intentional misrepresentation - fraud). All other counts in the complaint remain dismissed, either with prejudice (Count III, negligent misrepresentation), or without prejudice (Count I, breach of contract, Count IV, breach of fiduciary duty, Count V tortious interference) and Count VI Maryland Securities Act).

Court for the District of Maryland that the motion to dismiss the instant adversary proceeding be granted.

## PROPOSED FINDINGS OF FACT

1. On June 28, 2007, the debtor in possession, Wincopia Farms, LP ("WLP"), filed the instant Chapter 11 bankruptcy case. In its bankruptcy petition, WLP declared that the nature of its business was single-asset real estate, as that term is defined by 11 U.S.C. § 101(51B) of the Bankruptcy Code.[3] In Schedule A, the debtor in possession indicated that it owned approximately 124 acres of land (the "property") located in Howard County, Maryland, which it valued at approximately $30 million.

2. The property was encumbered by an indemnity deed of trust (the "IDOT") in favor of G&G, LLC,[4] a Virginia limited liability company, as guaranty[5] for commercial loans made to Wincopia Farms, Inc. ("WI" or "the borrower"), a separate

---

[3]"The term 'single asset real estate' means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto." 11 U.S.C. § 101(51B).

[4]On October 11, 2007, G&G filed Claim No. 6 as a secured claim in the amount of $11,255,401.59. On Schedule D, filed July 13, 2007, [P. 10], the debtor listed a secured debt to G&G in the amount of $11,000,000 as "disputed."

[5]The parties agreed that Maryland law governs both the IDOT and the guaranty.

4

legal entity that operated a nursery on the land under a lease from WLP. WI did not file a bankruptcy petition and is not a debtor.

3. Both WI and WLP were owned and operated by members of the Hearn family.

4. On August 1, 2007, G&G filed a complaint in the Circuit Court for Arlington County, Virginia, against non-debtors WI, Ruth Hearn, the Ruth Roberts Hearn Marital Trust and the Harry Cissel Hearn Marital Trust, based upon loan defaults. On November 9, 2007, the circuit court entered judgments against the trusts and WI in the amount of $12,118,909.04. On December 28, 2007, the court entered a judgment against Ruth Hearn in the same amount. On January 10, 2008, she filed a motion to vacate the judgment, which the court denied on January 25, 2008.

5. On October 2, 2007, G&G filed a motion for relief from the automatic stay [P. 38] in the instant bankruptcy proceeding of WLP. On December 13, 2007, this Court modified the automatic stay by order [P. 88], that required WLP to tender payments to G&G and satisfy certain other conditions in order for the automatic stay to remain in effect. The automatic stay was terminated on December 31, 2007, upon the failure of Wincopia to comply with the conditions.

6. On January 24, 2008, a sale of the property was scheduled to occur on February 14, 2008, On February 13, 2008, WLP filed a motion in the Circuit Court

for Howard County to stay the sale, in which it charged G&G with fraud. The circuit court denied the stay and the property question was sold at auction on February 14, 2008, to G&G, which purchased the property for $12,500,000.

7. On April 2, 2008, WLP filed objections to the ratification of the sale which the circuit court overruled, and the sale was finally ratified on July 17, 2008. On August 8, 2008, WLP filed a notice of appeal.

8. On appeal, the Court of Special Appeals affirmed the denial of an injunction against the sale. *Wincopia Farm v. Goozman*, 188 Md. App. 519, 982 A.2d 868 (2009), *cert. denied*, 412 Md. 496, 988 A.2d 1010 (2010). The Court of Special Appeals did not address the merits of the fraud allegations raised by WLP, other than to state its conclusion that "any alleged misconduct . . . was 'totally unrelated to [the] default.'" 982 A.2d at 875.

9. Meanwhile, on November 9, 2007, Wincopia filed the instant adversary proceeding in this Court in which it alleged that G&G had committed fraud against WI in making the various loan transactions.[6] On April 9, 2008, the plaintiff filed a first amended complaint [P. 25], which, as indicated *supra*, alleged breach of contract

_____

[6]The first complaint cited 28 U.S.C. §157(b)(2)(A), (E), (F), (H) and (O) as authority for the jurisdictional statement that it was a core proceeding, and set forth allegations of common law fraud, statutory fraud, actual and constructive fraud, fraudulent conveyance, tortious interference, breach of fiduciary duty, good faith and fair dealing and officer liability. [P. 1].

(Count I), intentional misrepresentation and fraud (Count II), negligent misrepresentation (Count III), breach of fiduciary duty (Count IV), tortious interference (Count V) and Maryland Securities Act violations (Count VI).

10. On March 25, 2009, this Court granted the defendant's motion to dismiss the complaint on the ground that under the law of Virginia, which appeared to govern the guaranty, the plaintiff/debtor lacked standing as guarantor of the loans to maintain causes of action against G&G as lender for making the loans to WI as borrower. Because all of the counts in the complaint against G&G were derivative of the rights of the borrower, the opinion held that WLP had no standing to pursue the claims as guarantor. In addition, Count III that alleged negligent misrepresentation was dismissed on the merits under the "economic loss" rule. Memorandum opinion, *supra* [P. 151].

11. On March 31, 2009, WLP filed a motion to reconsider the dismissal [P. 161] only as to Count II, based upon the assertion that the guaranty was governed by Maryland law rather than the law of Virginia, but that under the law of both states, the plaintiff had the right as guarantor, independent of the rights of the borrower, to sue the lender for fraudulently inducing it to enter into the indemnity deed of trust.

12. On May 29, 2009, this Court granted the motion by order [P. 175] which vacated the dismissal order only as to Count II.

13. Meanwhile, on May 21, 2009, WLP filed the instant motion to amend its complaint [P. 172], to which it appended as an exhibit its proposed second amended complaint.[7]

---

[7]The second amended complaint is set forth in its entirety as follows:

### SECOND AMENDED COMPLAINT

Plaintiff, Wincopia Farms, LP ("Wincopia") by its attorney, James E. Carbine, files this Second Amended Complaint against G&G, LLC ("G&G") and 10010 Gorman Road, LLC.

1. Plaintiff, Wincopia is a Maryland limited partnership with its principal place of business in Howard County, Maryland. [Wincopia LP was the Guarantor for a series of loans and loan modifications between G&G and Wincopia Farms, Inc. ("Wincopia Inc."). The Hearn family, a family of naive farmers, formed Wincopia LP and Wincopia Inc.]

2. Defendant G&G is a Virginia limited liability company with its principal place of business in McLean, Virginia. G&G transacts business in the state of Maryland, possesses an ownership interest in real property located in the state of Maryland and has caused tortious injury within the state of Maryland by acts and omissions committed in this state.

3. Defendant 10010 Gorman Road, LLC, is a Maryland limited liability company with its principal office in Bethesda, Maryland.

4. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

5. This is a core proceeding under 28 U.S.C. § 157 (b)(2).

6. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. Wincopia owns approximately 124 acres of valuable farm land in Howard County ("Farm") which it leases to Wincopia Farms, Inc. ("Borrower") for the Borrower's farming operations. The sole general partner of Wincopia is Ruth Roberts Hearn, who is also the sole stockholder of the Borrower. The Farm has been in the Hearn family for approximately 175 years.

8. By the late 1990's the Borrower needed to borrow a substantial amount of money for working capital required for its farming operations. This indebtedness reached $2,910,039.60 by the spring of 2002, when the holder of its promissory note was one United Bank ("United Bank Loan"). The United Bank Loan was secured by the Farm. By the spring of 2002, the United Bank Loan had matured and United Bank was unwilling to extend the loan. In order to prevent a foreclosure, the Borrower needed to find a lender willing to refinance the United Bank Loan.

9. The Borrower applied for the necessary refinancing with one First Union Bank, whose loan officer instead referred the Borrower to D. Trent Gourley, the owner and operator of Defendant G&G. G&G is a lender/developer in the business of making what are commonly known as sub-prime loans secured by real estate.

10. The Borrower sought traditional financing to be repaid over a period of years in amortized equal monthly payments of principal and interest. Instead, on July 18, 2002, G&G purportedly loaned the Borrower $4.5 million for 12 months at an interest rate of 12% on take-it-or-leave-it terms ("2002 Loan"). Of the loan amount, only $3,647,816 was paid to, or on behalf of, the Borrower. The balance of the loan was used to fund the payment of closing costs, loan fees and the prepayment of interest in the form of the mandatory purchase of a membership interest in G&G.

11. Wincopia was required to guarantee the 2002 Loan and required to execute an indemnity deed of trust, whereby Wincopia

conveyed the Farm to G&G, in trust, as security for the repayment of the

2002 Loan ("2002 Mortgage").

12. Upon the maturity of the 2002 Loan, the Borrower was unable to repay it. In order to avoid a loan default, the Borrower was forced to apply to G&G for a loan modification and extension agreement. On July 18, 2003, G&G purportedly increased the amount of the loan from $4.5 million to $5.4 million for 12 months at an interest rate of 16.36% on take-it-or-leave-it terms ("2003 Loan"). Of the increased loan amount, nothing was paid to the Borrower. At closing, the settlement officer disbursed the balance to G&G as an additional capital contribution.

13. In connection with the 2003 Loan, Wincopia was required to execute a new guaranty of payment and to execute a new indemnity deed of trust in the form of a modification agreement ("2003 Mortgage").

14. Upon the maturity of the 2003 Loan, the Borrower was unable to repay it. In order to avoid a loan default, the Borrower was forced to apply to G&G for a second loan modification and extension agreement.

15. On August 24, 2004, G&G purportedly increased the amount of the loan from $5.4 million to $7.0 million for 12 months at an interest rate of 16.36% on take-it-or-leave it terms ("2004 Loan"). Although $250,000 was set aside as a credit line, the line was never utilized. As such, of the increased loan amount nothing was paid to the Borrower.

16. In connection with the 2004 Loan, Wincopia was required to execute a new guaranty of payment and to execute a new indemnity deed of trust in the form of a modification agreement ("2004 Mortgage").

17. Upon the maturity of the 2004 Loan, the Borrower was unable to repay it. In order to avoid a loan default, the Borrower was forced to apply for refinancing. This time, the Borrower was able to secure a commitment from another lender. However, immediately prior to the closing of this take-out loan, G&G persuaded the Borrower to refinance the 2004 Loan with G&G by offering to loan the Borrower more funds than would otherwise have been available in the take-out financing.

18.  As a result of this inducement, on September 2, 2005, the Borrower entered into a third loan modification and extension agreement with G&G, whereby G&G purportedly increased the amount of the loan from $7.0 million to $9.4 million for 12 months at an interest rate of 16.36% on take-it-or-leave-it terms ("2005 Loan").  Of the new loan amount, something less than $1.5 million was paid to the Borrower.

19.  In connection with the 2005 Loan, Wincopia was required to execute a new guaranty of payment and to execute a new indemnity deed of trust in the form of a modification agreement ("2005 Mortgage").

20.  Upon the maturity of the 2005 Loan, the Borrower was unable to repay it.  In order to avoid a loan default, the Borrower was forced to apply to G&G for a fourth loan modification and extension agreement.

21.  On November 11, 2006, G&G purportedly increased the amount of the loan from $9.4 million to 9.8 million for a term of fifty days at an interest rate of 16.36% on take-it-or-leave-it terms ("2006 Loan").  The fourth loan and extension agreement was backdated as of August 1, 2006.  Of the new loan amount, nothing was paid to the Borrower.

22.  In connection with the 2006 Loan, Wincopia was required to execute a new guaranty of payment and to execute a new indemnity deed of trust in the form of a modification agreement ("2006 Mortgage").

23.  Fifty days later, on January 1, 2007, the 2006 Loan matured without being paid.  Shortly thereafter, G&G declared a default of the Borrower's obligations under the 2006 Loan, enforced the payment guaranty against Wincopia and commenced foreclosure proceedings against the Farm on May 11, 2007.

24.  On February 14, 2008, G&G purchased the Farm at the foreclosure sale for $12,500,000.  Because of an intervening appeal of the foreclosure proceeding, Wincopia believes and therefor avers that title has not yet been conveyed to G&G.

25. Once title to the Farm is conveyed, G&G has stated an intention to have title conveyed to Defendant 10010 Gorman Road, LLC, a new limited liability company that G&G formed expressly for the purpose of taking title to the Farm.

26. 10010 Gorman Road, LLC, is an alter ego of G&G. The acts of G&G complained of in this Second Amended Complaint are the acts of 10010 Gorman Road, LLC. 10010 Gorman Road, LLC, is not a bona fide, good faith purchaser of the Farm and is the beneficiary of the fraud alleged hereinbelow. As such 10010 Gorman Road, LLC, is jointly and severally liable to the Plaintiff for the fraud of G&G.

27. Wincopia was fraudulently induced to execute its guaranty of payment of the 2002 Loan, 2003 Loan, 2004 Loan, 2005 Loan and 2006 Loan (collectively the "Loans") and to execute the 2002 Mortgage, 2003 Mortgage, 2004 Mortgage, 2005 Mortgage and 2006 Mortgage (collectively the "Mortgages") by G&G in the manner set forth hereinbelow.

28. In addition to the misrepresentations made to the Borrower, G&G made the following false representations of material facts to Wincopia.

a. By its actions, documents and statements, G&G led Wincopia to believe that the Borrower had been "approved" for the Loans. In furtherance of this scheme, G&G issued a formal, written "loan commitment" and extracted a "loan commitment fee." In fact, despite taking a $4,000 loan underwriting fee, G&G took no steps to determine whether the Borrower could repay the loan, had no loan underwriting staff, had no loan underwriting guidelines and had no underwriting files. The only investigation G&G performed before deciding to make the Loans was to satisfy itself that the Farm was a valuable piece of real estate and satisfy itself that the value far exceeded the amount of the Loans. G&G has since admitted that prior to making the Loans it knew that the Borrower would be incapable of repaying the Loans absent a refinancing.

b.  Wincopia wanted to guarantee a loan which would be repaid over a period of years in amortized equal monthly payments of principal and interest. Instead, to induce Wincopia to guarantee payment of a 12 month loan with prepaid interest and fees, by its actions, documents and statements, G&G led Wincopia to believe that its desire for a longer term loan would be satisfied by a "good behavior" extension right offered to the Borrower.  In fact, since all the loans had prepaid interest and fees with a balloon payment of the entire amount of the loan due annually, there was no "good behavior" by which to judge the merits of an extension. Contrary to its representations, G&G knew that the "good behavior" extension was a ruse to extract unconscionable terms, conditions, waivers, interest and fees on an annual basis and make it impossible for the Borrower to repay the Loans.

c.  Wincopia wanted G&G to loan the Borrower at least $750,000 more than the $3,647,816 which was actually paid to, or on behalf of, the Borrower.  The extra money requested by Wincopia was for money the Borrower desperately needed as working capital in its business.  The purpose of the request was to greatly improve the ability of the Borrower to repay the 2002 Loan and to make a loan default less likely.  In response, G&G said that it didn't have the funds available to do so. Saying that it did not have enough money to make the additional loan advance was a false statement of fact which G&G knew to be false at the time it was made.  In fact, as of October 22, 2002, G&G admitted that it had approved a loan of $9.1 million in the same time period, but that the $9.1 million loan was never consummated.  Not only did G&G have $9.1 million in cash available at the time, but also was turning away investors during the period from May through October of 2002.  These potential additional deposits were put on a waiting list because G&G already had excess unused cash and didn't want to pay what it referred to as its "preferred rate of return" on unused capital funds.  The falsely justified refusal of G&G to loan the extra money to the Borrower virtually assured the Borrower's inability to pay back the loan.

d.  G&G told Wincopia that it could be represented by legal counsel in the loan transactions.  In fact, G&G acted in a manner by which it made meaningful legal representation by Wincopia's lawyers an

impossibility.

e. G&G represented to Wincopia that the Borrower owed the face amount of each of the Loans, when in fact the Borrower received fewer loan proceeds and paid higher interest rates than were authorized and represented by the loan documents.

f. G&G represented to Wincopia that the Borrower would have the benefits of owning a membership interest in G&G. In fact, G&G secretly, unilaterally and without legal justification reduced and subsequently eliminated those membership rights, depriving the Borrower of the benefits which it had promised Wincopia.

29. G&G knew the representations it made to Wincopia, described above, were false at the time they were made. Alternatively, G&G made those misrepresentations with such reckless indifference to the truth that it would be reasonable to charge G&G with knowledge of their falsity.

30. Wincopia justifiably relied on the misrepresentations described above in coming to its decision to guarantee payment of the Loans and its decision to execute the Mortgages.

31. In addition to the affirmative misrepresentations described above, G&G intentionally concealed the following material facts that G&G had a duty to disclose.

a. At least by the fall of 2001, G&G had an admitted policy of setting its borrowers up to fail so that it could take the collateral for itself. This self-styled "pawn shop" approach to lending had two distinctive features: (1) extend credit to desperate borrowers on take-it-or-leave-it terms, then (2) grossly over-collateralize the loans.

b. Prior to making the 2002 Loan to the Borrower on July 18, 2002, and prior to each of the subsequent Loans, G&G had in place a scheme and plan to purposefully structure the Loans so that default on the loan was a virtual certainty as soon as the ink dried on the loan

documents.  This was accomplished by restricting the amount of loan proceeds so as to deny the Borrower the working capital it needed to grow the farming business to the point where the Loans could be refinanced or paid, restricting the terms to one year, then creating the false impression in the mind of Wincopia that the term of the loan would be extended from year to year permitting the borrower the time it needed to repay the loan.

c.  By refusing to fund the loan adequately, shortening the term to 12 months and piling all of the fees and interest into the principal indebtedness, G&G pre-engineered the Borrower's default, at the end of each one-year "term."  With each passing year and with each "good behavior" extension, G&G dramatically increased the "principal" owed on the loan to the point where, by the 2006 Loan, take-out financing was no longer possible.

32.  All along, G&G's premeditated plan was to force a default in the Loans, then reap the huge windfall occasioned by its foreclosure on the Farm, its purchase of the Farm at foreclosure and its resale of the Farm for an amount greatly in excess of the amount owed it by the Borrower.

33.  This premeditated plan was concealed from Wincopia when Wincopia was fraudulently induced to unconditionally guarantee the 2002 Loan and convey its ownership of a $50 million piece of real estate for a $4.5 million dollar loan in the 2002 Mortgage.

34.  This premeditated plan was concealed from Wincopia with each increase on the amount of its loan guaranties and each modification of the indemnity deed of trust.  This fraudulent concealment continued through Wincopia's execution of the 2006 Mortgage.

35.  This premeditated plan was concealed from Wincopia to induce Wincopia to guarantee the Loans and to execute the Mortgages, all with the intent of having Wincopia act differently from how it would have acted had Wincopia known the true facts.

36.  In fact, Wincopia did act in a manner different from how Wincopia would have acted had it known the true facts, in that Wincopia agreed to guarantee the Borrower's payment of the Loans and, by executing the Mortgages, place at risk a $50 million piece of property to secure an indebtedness which was a fraction of that amount.

37.  As a direct and proximate result of the affirmative misrepresentations and fraudulent concealments of G&G, together with Wincopia's reasonable reliance thereon, Wincopia's Farm has been foreclosed upon, due to the Borrower's default on a loan of an amount which was a fraction of the Farm's fair market value, which default was purposefully pre-designed and pre-engineered by G&G.

38.  As a direct and proximate result of the affirmative misrepresentations and fraudulent concealments of G&G, together with Wincopia's reasonable reliance thereon, Wincopia has suffered damages in an amount equal to the fair market value of the Farm on the date G&G filed its foreclosure proceeding, less the amount of loan proceeds actually disbursed by it to, or on behalf of, the Borrower and less an amount equal to reasonable interest and loan fees to which G&G would otherwise have been entitled, absent its fraud.

39.  In addition to the foregoing, G&G actions described above were conscious and deliberate.  The falsity of G&G's statements was actually known to G&G.  G&G's concealment of its plan to pre-engineer the Borrower's default so as to wrongfully acquire the Farm was deliberate and intentional.  G&G's intent to deceive Wincopia, as described above, was sufficiently conscious and deliberate so as to amount to actual malice, as that phrase is defined by applicable law.  As G&G's alter ego, the actions in this regard by G&G are attributable to Defendant 10010 Gorman Road, LLC, as well.

WHEREFORE, Plaintiff Wincopia Farms, LP, demands judgment against Defendants, G&G, LLC, and 10010 Gorman Road, LLC, jointly and severally, for actual and compensatory damages in the amount of $40 million and punitive damages in the amount of $10 million.

14.   The second amended complaint added allegations of fraud allegedly committed by the defendants against WLP, *inter alia*, the misrepresentation that WI had been approved for the loans, whereas G&G made no determination that WI was creditworthy; that G&G led WLP to believe that WI enjoyed a so-called "good behavior" right of extension, which was false; that G&G misrepresented to WLP that WI received the face amount of each loan, whereas WI received a lower amount of loan proceeds at a higher rate of interest than the loan documents authorized, thereby inflating the obligation of WLP under its guarantee; that G&G misrepresented to WLP that WI would receive a membership interest in G&G; that G&G failed to disclose its secret policy of structuring loans in such a manner as to insure borrowers' defaults that enabled G&G to foreclose upon collateral and reap a windfall;  that such "pawn shop" lending involved extending credit to borrowers in desperate straits with unconscionable terms, making "grossly over-collateralized loans" that caused WLP to lose real property valued at $50 million that secured loans worth a fraction of the amount lent.

15.   On June 15, 2009, G&G filed a motion to dismiss the second amended complaint [P. 179] and an objection to the plaintiff's motion to file the second amended complaint [P. 180].  The bases for the motion and the objection are the same,

---

Second Amended Complaint [P. 172-3].

namely the grounds of futility and the failure to state a claim for which relief can be granted, including the failure to allege fraud with specificity.[8]

## PROPOSED CONCLUSIONS OF LAW

SUBJECT MATTER JURISDICTION

1. The U. S. Bankruptcy Court has subject matter jurisdiction over the instant adversary proceeding pursuant to 28 U.S.C. § 1334. Venue is appropriate pursuant to 28 U.S.C. § 1409.[9]

2. Federal bankruptcy jurisdiction operates *in rem*. *Tennessee Student Assistance Corporation v. Hood*, 541 U.S. 440, 124 S.Ct. 1905, 158 L. Ed.2d 764 (2004) (bankruptcy jurisdiction is based upon the debtor and the bankruptcy estate, and not on the creditors.).

3. The complaints at issue are *in personam* adversary proceedings filed in the bankruptcy court by a Chapter 11 debtor in possession for damages against a creditor based upon State law and common law causes of action based on allegations of fraud and misrepresentation. As such, the instant adversary proceeding is similar to that in

---

[8]On July 31, 2009, WLP filed a similar complaint against the same defendants in the U.S. District Court for the District of Maryland, based upon diversity of citizenship, which was dismissed on March 22, 2010, for lack of subject matter jurisdiction.

[9]Bankruptcy courts have the inherent power to question their own subject matter jurisdiction and to dismiss causes of action for lack thereof. *Brown v. GMAC Mortgage Corp. (In re Brown)*, 300 B.R. 871, 875 (D. Md. 2003).

the case of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83, 102 S.Ct. 2858, 73 L. Ed.2d 598 (1982), which was a suit for damages filed in the bankruptcy court by a Chapter 11 debtor against a creditor based upon a prepetition State law cause of action.[10]

4. In 1984, remedial legislation was enacted by Congress to provide procedures for bankruptcy courts to determine whether they had the power and authority to hear and determine various matters, depending upon the nature of the proceedings as core versus non-core, and whether the matters were "arising under," "arising in," or "related" to a bankruptcy case. *See* 28 U.S.C. § 157(b), (c), *et seq.*;[11]

---

[10]One difference, however, is that in *Marathon*, unlike the instant adversary proceeding, the defendant creditor did not file a proof of claim.

[11]Section 157(c) provides, as follows:

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

5.  Both complaints asserted that they are core proceedings, pursuant to 28 U.S.C. § 157(b)(2),[12] but neither set forth a specific subsection thereunder.  Likewise,

28 U.S.C. § 157(c).

[12]28 U.S.C. § 157(b)(2) provides, as follows:

### § 157. Procedures

\*    \*    \*    \*    \*    \*

(b)(2)  Core proceedings include, but are not limited to

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

20

because neither complaint set forth a specific section of the Bankruptcy Code as a basis for granting the relief requested, they do not appear to be a proceedings "arising under" the Bankruptcy Code. Because they seek the recovery of damages that were incurred postpetition, they are not matters "arising in" the bankruptcy case because both complaints purport to be based on fraud that was alleged to have been perpetrated prepetition, even though the property was sold postpetition under the aegis of the State court.

---

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

(P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

28 U.S.C. § 157(b)(2).

6. The complaints at issue are non-core civil proceedings related to the bankruptcy case.[13] *Millennium Studios, Inc. v. Man Roland, Inc. (In re Millennium Studios)*, 286 B.R. 300 (D. Md. 2002) (debtor's prepetition state law breach of contract and tort claims were non-core matters related to the bankruptcy case).

7. The complaints do not purport to be objections to claim or counterclaims against a creditor that filed a proof of claim so as to bring them within the core jurisdiction of the bankruptcy court. *See* Fed. R. Civ. P. 13 and Fed. R. Bankr. P. 7013. The allegations raised in the instant adversary proceeding are State law causes of action sufficiently attenuated from the basis of the claim itself to be outside of the core jurisdiction of the bankruptcy court to enter final orders disposing of the issues raised herein. *See Marshall v. Stern (In re Marshall)*, 600 F.3d 1037 (9th Cir.2010). The fact that the creditor's claim has already been allowed by the action of the bankruptcy court in lifting the stay and the action of the State court in ratifying the sale of the property indicate that the pending complaints are not in the nature of objections to the claim. Likewise, it is doubtful that the complaints could be

---

[13]They are not core proceedings because they do not constitute objections to claim, nor counterclaims; they do not request extension of credit, nor turnover of estate property; they do not seek to avoid preferences or fraudulent conveyances, or to terminate the automatic stay; they do not deal with denial of discharge, determination of dischargeability of debt, confirmation of plans, use of cash collateral, sale or lease of property, or any other matters therein enumerated.

considered to be counterclaims filed against the creditor's claim where they assert a private and not a Federally-created public right.

8.  In *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002, n. 11 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986), the Fourth Circuit endorsed *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.1984) as the proper standard for determining "related to" jurisdiction, namely, when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor*, 743 F.2d at 994. In the instant adversary proceeding, the debtor's recovery of damages against the lender would augment the bankruptcy estate and provide a source of funds to pay the claims of creditors. Therefore, the instant complaints, though non-core, are proceedings related to the bankruptcy case.[14]

## THE MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT WILL BE GRANTED

9.  This Court will grant the plaintiff's motion to file its second amended complaint because (1) amendments are freely allowed; (2) the defendant's motion to dismiss the second amended complaint cannot be considered in the absence of the second amended complaint becoming part of the record of this adversary proceeding

---

[14]The foregoing conclusions of law form the basis for this Court to prepare this opinion as a Report and Recommendation to the Article III U. S. District Court for the entry of final orders.

and (3) because the order will be signed by this U.S. bankruptcy judge because the order granting the motion to amend is not a final, dispositive order.

## DISMISSAL IS PROPER BASED UPON LACK OF STANDING

10.  While the debtor as "party in interest" has standing to object to a claim filed in the debtor's bankruptcy case,[15] *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 626-7 (2d Cir.2007), nonbankruptcy law may limit the debtor's standing to object to a particular type of state law claim that is asserted in a bankruptcy case, as in the instant adversary proceeding regarding the debtor's rights and liabilities under a guaranty.[16]

11.  Maryland appears to be in line with the majority view that a guarantor of a loan is without standing to sue the lender for alleged fraudulent misconduct in making a loan to the borrower, absent an independent harm to the guarantor.  The Court has found no Maryland cases to the contrary.

---

[15]Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects."  11 U.S.C. § 502(a).

[16]As the earlier opinion of this Court stated, Virginia courts agree with the majority view that a guarantor has no standing to sue a lender for wrongs done to a borrower, absent an independent harm to the guarantor, citing *Mullins v. 1st Nat'l Exc. Bank of Va.*, 275 F. Supp. 712 (E.D. Va. 1967); *Keepe v. Shell Oil Co.*, 260 S.E.2d 722, 724, 220 Va. 587 (1979); *Shuman v. McGhee (In re McGhee)*, 80 B.R. 65, 70 (Bankr. E. D. Va. 1987).  *See also Temp-Way Corp. v. Continental Bank*, 139 B.R. 299, 317 (E.D. Pa. 1992).

12. WLP is secondarily liable as guarantor for the repayment of the loan to G&G. The absolute or unconditional guaranty in this case represents its absolute promise to stand liable for the obligation of WI as the principal.[17]

---

[17]As the Maryland Court of Appeals has stated:

A contract of guaranty, similar to a contract of suretyship, is an accessory contract. *See Hooper v. Hooper*, 81 Md. 151, 169, 31 A. 508, 510. Despite this similarity, a contract of guaranty has several distinguishing characteristics. First, this particular contract is collateral to and independent of the principal contract that is guaranteed and, as a result, the guarantor is not a party to the principal obligation. A guarantor is therefore secondarily liable to the creditor on his contract and his promise to answer for the debt, default, or miscarriage of another becomes absolute upon default of the principal debtor and the satisfaction of the conditions precedent to liability. *See Kushnick v. Lake Drive Building & Loan Association*, 153 Md. 638, 641, 139 A. 446, 447 (quoting *Booth v. Irving National Exchange Bank*, 116 Md. 668, 673, 82 A. 652, 654). Second, the original contract of the principal is not the guarantor's contract, and the guarantor is not bound to take notice of its nonperformance. Rather, the guarantor agrees that the principal is able to and will perform a contract that he has made or is about to make, and that if he defaults the guarantor will pay the resulting damages provided the guarantor is notified of the principal's default. As such, the guarantor insures the ability or solvency of the principal. Third, the contract of guaranty is often founded upon a separate consideration from that supporting the contract of the principal and, consequently, the consideration for the guarantor's promise moves wholly or in part to him. Fourth, and in sum, the guarantor promises to perform if the principal does not. By contrast, a surety promises to do the same thing that the principal undertakes. *See* A. Stearns, *The Law of Suretyship*, § 1.5, at 5 (J. Elder 5th ed. 1951). *See generally* 10 S. Williston, *A Treatise on the Law of Contracts* § 1211, at 685-86 (W. Jaeger 3d ed. 1967) (discussing distinction between surety and guarantor).

*GMAC v. Daniels*, 303 Md. 254, 259-61, 492 A.2d 1306, 1309-10 (1985); *see also*

13. WLP has cited the decision of the Court of Appeals of Maryland in *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 652 A.2d 1117 (1995), in support of its argument that it has standing to sue, specifically that in Maryland, a guarantor has independent standing to bring a cause of action against the lender for fraudulently inducing the guarantor's execution of the guaranty. However, that decision is inapposite to the present adversary proceeding because *Ellerin* was a suit *brought by the lender* (Fairfax) *against the guarantors* (Ellerin and others) on their personal guaranties of a corporate loan after default by the borrower (Sherwood Square Associates). The defendant guarantors (the general partners of Sherwood) filed counterclaims seeking damages from the lender for fraud in the inducement. They alleged that the guarantees had been altered to impose greater liabilities upon the guarantors than they had agreed to assume and for additional events of default not contemplated by the parties. A jury found that Fairfax had committed fraud in the alteration of the guaranties and awarded compensatory and punitive damages. The Court of Appeals overturned the punitive damage award on the ground that there had been no proof of actual malice to justify exemplary damages and remanded the case

---

*Atlantic Contracting & Material Co. v. Ulico*, 380 Md. 285, 844 A.2d 460 (2004), *Middlebrook Tech, LLC v. Moore*, 157 Md. App. 40, 65, 849 A.2d 63, 78 (2004). Cited in *Bel-Ken Assocs. Ltd. P'ship v. Clark*, 83 B.R. 357 (D. Md. 1988).

for a new trial on that issue. 652 A. 2d at 1129. The point is, however, that the lawsuit in *Ellerin* was initiated by the lender, and not by the guarantors.

14. An examination of the newly-made allegations contained in the second amended complaint reveals that they fall short of alleging independent causes of action amounting to fraudulent inducement in making the guaranty, and instead allege fraud in the making of the loans themselves:

(a) Whether G&G misrepresented that WI had been approved for the loans but had performed no due diligence is unavailing to WLP. The plaintiff's guaranty of the borrower's ability to repay the loan is absolute and not dependent upon any finding by G&G that WI was creditworthy. Another way of stating this proposition is that WLP cannot justifiably rely on the willingness of G&G to make the loan as a basis for WLP executing its guaranty.

(b) Whether G&G led WLP to believe that WI enjoyed a so-called "good behavior" right of extension, which was false, is also unavailing, because the guaranty is absolute, *Heyman v. Dooley*, 77 Md. 162, 26 A. 117 (1893) (terms of an absolute guaranty govern the rights of the parties to the extent that even notice of default is unnecessary to enforce the guaranty), and because the lender is not a fiduciary as to the guarantor under the loan agreement with the borrower, *Schrager v. North*

*Community Bank*, 328 Ill. App. 3d 696, 767 N.E.2d 376, 262 Ill. Dec. 916 (1st Dist. 2002); *Warner v. Clementson*, 254 Va. 356, 492 S.E.2d 655 (1997).

(c) Whether G&G misrepresented to WLP that WI received the face amount of each loan, thereby inflating the obligation of WLP under its guaranty, is also insufficient. While such a claim of fraud might be a defense to an action to collect a specific amount from the guarantor whereas a lesser amount was actually disbursed, here the guarantor is seeking damages for the loss of the property, where there is no debate that the borrower was in default at the time the loans were called.

(d) Whether G&G misrepresented to WLP that WI would receive a membership interest in G&G amounts a claim for securities fraud that the borrower, not the guarantor, might have against the lender.

(e) Whether G&G failed to disclose its secret policy of structuring loans so as to insure borrowers' defaults, thus enabling G&G to foreclose upon the collateral, standing alone, is not sufficient to create a cause of action in favor of the guarantor. The parties were well aware that the nature of so-called "pawn shop" lending involved extending credit to borrowers in desperate straits with unconscionable terms, which WLP accepted.

(f) The fact that the loans were over-collateralized does not amount to fraud, where the amount lent was a fraction of the value of the $30 million property that secured the loans, and this disparity was disclosed fully.

(g) The allegation that G&G misrepresented the fact that it did not have in its possession the necessary funds to lend to WI when the loan was needed desperately is irrelevant because it was not obligated to advance additional monies under the terms of the loans.

15. Therefore, unlike *Ellerin*, where fraud in the inducement was raised by a counterclaim as a defense to a suit brought by the lender, WLP as guarantor has brought suit against the lender in the bankruptcy court based upon allegations of fraud committed against the borrower. As such, the causes of action asserted by WLP are merely derivative of the borrower's rights against the lender and are not independent of them.[18]

16. The guaranty has been enforced by proceedings that were conducted in a State circuit court that cannot now be challenged and/or undone by this Court.

17. G&G came into lawful possession of property of the bankruptcy estate after obtaining relief from the automatic stay, after which it foreclosed upon the IDOT and

---

[18]In *Bessette v. Weitz*, 148 Md. App. 215, 811 A.2d 812 (2002), the Court of Special Appeals held that a guarantor had standing to raise the same defenses to the claim as did the principal obligor. In *Ellerin*, the same court appeared to acknowledge that a guarantor had standing to sue a lender for fraudulently inducing the guaranty.

sold the property at auction pursuant to a valid State court order which was affirmed on appeal. This Court has held that after relief from the automatic stay was granted in favor of a secured creditor as to a debtor's accounts receivable, there was no subject matter jurisdiction to entertain a suit brought in the bankruptcy court by the creditor against third parties because the accounts were no longer property of the estate. *First Nat'l Bank of Maryland v. United States Wall Corp. (In re Incor, Inc.)*, 100 B.R. 790, 793 (Bankr. D. Md. 1989), *aff'd*, 113 B.R. 212 (D. Md. 1990). The property that is the subject of the instant complaints is no longer property of the debtor's bankruptcy estate. 11 U.S.C. § 541(a). *See also County Fuel Co. v. Equitable Bank Corp.*, 832 F.2d 290, 293 (4th Cir.1987) (subsequent suit against bank was precluded by allowance of bank's claim in bankruptcy case followed by grant of relief from the automatic stay that allowed bank to foreclose and obtain satisfaction of its "entire principal secured claim").

18.  For purposes of the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "the Court must accept as true all well-pleaded allegations in the complaint, including all reasonable inferences that may be drawn from them, in the light most favorable to the plaintiff." *Hemelt v. Pontier, (In re Pontier)*, 165 B.R. 797, 798 (Bankr. D. Md. 1994). "[A] complaint should not be dismissed 'merely because the court doubts that the plaintiff will ultimately prevail; so long as a plaintiff

colorably states facts which, if proven, would entitle him to relief, the motion to dismiss should not be granted.'" *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 145, n. 8 (4th Cir. 1990), *quoting Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir.1982).

19.  However, where the party lacks standing to bring the cause of action, a motion to dismiss premised on that ground may properly be granted. *See, e.g., White Tail Park, Inc. v. Stroube*, 413 F.3d 451 (4th Cir. 2005).

WHEREFORE, having granted the plaintiff's motion to file a second amended complaint, this Court recommends to the U. S. District Court that the said second amended complaint be dismissed upon the motion of the defendant, G&G.

cc:    James E. Carbine, Esquire
James E. Carbine, P.C.
111 South Calvert Street, Suite 2700
Baltimore, Maryland 21202
Counsel to the Plaintiff

James R. Schroll, Esquire
Bean, Kinney & Korman, PC
2300 Wilson Blvd., 7th Floor
Arlington, Virginia 22201
Counsel to the Defendant G&G, LLC

Jeffrey Wayne Bernstein, Esquire
Goozman, Bernstein & Markuski
9101 Cherry Lane, Suite 207
Laurel, Maryland 20708
Counsel to the Defendant Trent Gourley

Alan M. Grochal, Esquire
Tydings & Rosenberg LLP
100 E. Pratt Street, Floor 26
Baltimore, Maryland 21202
Counsel to the Debtor

Office of the U.S. Trustee
2625 U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

United States District Court
   for the District of Maryland
4228 U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201